MANAGEMENT KINETICS, INC., d/b/a Environetics, Plaintiff-Appellee, v. LEXINGTON INSURANCE COMPANY, Defendant-Appellant and Cross-Defendant (Rose-Tillmann Company, Cross-Claimant and Appellee).

First District (6th Division)    No. 1—92—4330

Opinion filed January 13, 1995.

Nicholas H. Diacou and Cary E. Donham, both of Shefsky & Froelich, Ltd., of Chicago, for appellant.

Daniel Swartzman and Kimberlee Massin, both of Schoenfield & Swartzman, of Chicago, for appellee Management Kinetics, Inc.

Steven C. Rueckert, of Chicago, for appellee Rose-Tillmann Co.

JUSTICE EGAN delivered the opinion of the court:

This is an appeal by defendant Lexington Insurance Company (Lexington), from an order granting summary judgment in favor of the plaintiff, Management Kinetics, Inc., d/b/a Environetics (Environetics), and defendant Rose-Tillmann Co. (Rose-Tillmann).

Environetics is a corporation providing environmental consulting services. In 1990, Frank DeFranza, the president of Environetics, contacted Rose-Tillmann, a retail insurance broker, to secure errors and omissions insurance to cover the consulting activities of Environetics. Rose-Tillmann contacted National Risk Management, Inc. (National Risk), an insurance wholesaler, which then contacted Midwestern Risk Specialists, Inc. (Midwestern), a surplus line insur-

ance producer and agent of Lexington. Midwestern contacted Lexington, which issued a policy to Environetics in November 1990.

Environetics sent its gross premium plus surplus lines tax and stamping fee of $46,700 to Rose-Tillmann. Rose-Tillmann took a $2,000 commission and passed on the premium to National Risk. National Risk took a commission and passed on the premium to Midwestern, which took a commission and passed on the remaining $40,700 to Lexington.

In June 1991, Environetics received a copy of the insurance policy from Lexington. The policy did not cover much of the activities of Environetics and contained a number of provisions that were not disclosed at the time of purchase. On September 20, 1991, the attorney for Environetics wrote letters to Rose-Tillmann and Lexington, demanding a full refund of the premium and of the taxes and fees paid to secure the policy. The amount demanded was $46,700.

Ten days later, Lexington's senior vice-president, Richard H. Bucilla, said by letter that Environetics should be "looking somewhere else" for someone to blame for the fact that the policy was not the one Environetics wanted but agreed to settle if Environetics would return the policy through its "broker" for flat cancellation, with a cover letter releasing Lexington; Lexington would then instruct its agent Midwestern to return the premium through Environetics' "broker."

The offer by Bucilla was accepted by Environetics through a letter from its attorney on October 8, 1991. That letter informed Bucilla that Environetics had "already notified Rose-Tillmann's attorney of Environetics' intention." An attorney for Rose-Tillmann accepted the settlement in a letter of October 18, 1991, to Bucilla, a copy of which was sent to the attorney for Environetics.

On November 8, 1991, Environetics returned the policy to Rose-Tillmann, along with a cover letter which cancelled the policy, "pursuant to [Environetics'] agreement with Lexington Insurance, and in return for receiving all monies paid by [Environetics] on this policy." Rose-Tillmann returned the policy to National Risk, which returned it to Midwestern, which returned it to Lexington.

Environetics never received any money from Lexington and filed a three-count complaint against Lexington, Rose-Tillmann, Midwestern and National Risk. Lexington and Midwestern filed a counterclaim against Rose-Tillmann, seeking a declaration that Rose-Tillmann was responsible to pay the return premium and sought indemnification from Rose-Tillmann. Rose-Tillmann cross-claimed against Lexington and Midwestern, also asserting a right to indemnification. Rose-Tillmann returned its $2,000 commission to

the plaintiff. National Risk filed for bankruptcy after the complaint was filed. It is the insolvency of National Risk that is the root of the controversy.

The judge granted summary judgment in favor of the plaintiff and against Lexington and Rose-Tillmann, jointly and severally; he also entered summary judgment in favor of Rose-Tillmann and against Lexington on Rose-Tillmann's claim for indemnification.

After examining the complaint, exhibits, affidavits and answer to interrogatories, we conclude that Lexington kept the cash it ultimately received from the plaintiff and that Lexington considered that its obligation to the plaintiff was satisfied by book entries of credit and debit.

In his affidavit, Richard Gundlach, a vice-president of Midwestern, described the path of what he considered a return of the premium. National Risk delivered to Midwestern a check in the amount of $99,851.20, which included the notation, "Robinette Demolition less Environetics." Robinette Demolition was another insured on whose behalf National Risk had sought and received coverage from Lexington through Midwestern. According to Gundlach, Lexington and Midwestern paid the premium to National Risk when National Risk reduced an amount payable to Midwestern by $40,766.40. By so giving credit to National Risk, Lexington fulfilled its obligation to the plaintiff. About six weeks after the "settlement" between the plaintiff, Rose-Tillmann and Lexington, Gundlach learned that National Risk was having financial difficulties.

The plaintiff did not have notice of and did not agree to Lexington using a credit and debit system of payment. All parties agree that the issue is whether the parties agreed to the manner of payment now advanced by Lexington.

The language of the agreement is neither lengthy nor complex: Lexington, which made the offer, said it would instruct Midwestern "to return *the premium* through" Rose-Tillmann. (Emphasis added.) Lexington required the plaintiff to return the policy through Rose-Tillmann. We have emphasized "the premium" because no reasonable person would construe that phrase to mean anything but cash or a check in the sum of $46,700. We also point out that it was Lexington which insisted that the plaintiff turn over the policy to Rose-Tillmann and that Rose-Tillmann would be the conduit through which the plaintiff would receive the premium. In short, it was Lexington, not the plaintiff, which brought Rose-Tillmann into the cancellation and return process.

At this point, it is appropriate to address an argument made by Lexington in its reply brief in which it maintains that when Bucilla

said in his offer of settlement that the plaintiff was to return the policy through the plaintiff's "broker," he was referring to National Risk, not Rose-Tillmann. We reject that belated argument. The record clearly refutes it. On October 8, 1991, in response to Bucilla's offer of September 30, 1991, the attorney for Lexington informed him by letter that he would send the requested cancellation and release "and the policy to Rose-Tillmann." The attorney for Rose-Tillmann wrote to Bucilla on October 18, 1991, informing him that "Rose-Tillmann, the retail broker with respect to the Environetics, Inc. account has agreed to the terms of your letter of September 30, 1991." There was never any mention by anyone of National Risk. There was no demurrer by Bucilla to the identification of Rose-Tillmann as the broker mentioned in Bucilla's offer by the lawyers for Rose-Tillmann and the plaintiff. Indeed, in Lexington's cross-claim, it was alleged:

> "On or about October 8, 1991, Rose-Tillmann, acting on behalf of plaintiff and within the scope of its agency, agreed with Lexington and Midwestern that Rose-Tillmann would pay the return premium to plaintiff, with respect to a liability insurance policy issued to Environetics by Lexington."

The plaintiff followed the agreement to the letter. It returned the policy to Rose-Tillmann along with a cover letter which cancelled the policy "pursuant to our [Environetics'] agreement with Lexington Insurance, and in return for receiving all monies paid by us on this policy." Rose-Tillmann also followed the agreement to the letter. In sum, the judge held, as a matter of law, that the agreement required Lexington to return a sum of money to the plaintiff; that Lexington did not do so; and that the plaintiff performed its end of the agreement. We agree.

Lexington has raised other arguments which we will address briefly. It says that the judge ignored the fact that Midwestern was also part of the agreement and that the plaintiff is bound by its agent Rose-Tillmann's inclusion of National Risk in the settlement agreement. Lexington also points out that in Gundlach's affidavit he said that Midwestern "understood that National Risk was a party to the settlement."

In response, we say that whether Lexington considered Midwestern part of the agreement and whether Midwestern understood that National Risk was a party to the settlement are apropos of nothing at all when we consider the face of the agreement. Rose-Tillmann could not and did not include National Risk in the settlement agreement simply by forwarding the policy to National Risk.

Lexington repeatedly asserts that Rose-Tillmann and National Risk were the agents of the plaintiff; that these agents agreed to the

bookkeeping entry method of repayment and thereby bound the plaintiff. Lexington relies on *Middle Western Telephone Co. & Ohio Central Telephone Corp. v. United States Fire Insurance Co.* (1938), 296 Ill. App. 260, 16 N.E.2d 188. In that case, the plaintiffs commissioned a broker to procure insurance. The broker arranged for a temporary policy with the defendant. The broker delivered the policy to the plaintiff with his own bill for the premium. The plaintiffs paid the amount of the premium to the broker. Six months later, the plaintiffs forwarded the policy to the broker and ordered him to surrender it to the defendant for cancellation. At the time there was an unearned premium, which the defendant insurer credited to the broker's account.

The attorneys for the broker and the plaintiff entered into a settlement agreement by which the broker was to reimburse the plaintiff. The broker breached the agreement, and the plaintiff sued the defendant insurer. The appellate court affirmed the judgment in favor of the insurer.

Frankly, we are at a loss to understand why Lexington cites this case; it is authority for the plaintiff's position here. First, the broker in *Middle Western* got the unearned premium in the form of the credit. Rose-Tillmann did not get the return premium. Second, the court held that the broker acted outside the scope of his authority by retaining the amount due the plaintiff, but that the plaintiffs by their subsequent conduct in entering into a settlement agreement with the broker ratified the actions of the broker.

In the case before us, the plaintiff did not ratify any actions that Rose-Tillmann might have taken in the transaction. Indeed, the plaintiff immediately notified Lexington and Rose-Tillmann that it would hold both of them accountable for the return of the premium.

Anticipating that Lexington may urge that *National Risk* acted as the broker did in *Middle Western*, we wish to make our holding clear that Lexington has failed, as a matter of law, to show that National Risk was an agent of the plaintiff acting in the scope of its authority when it claimed a credit for an amount due its principal, if there was in fact ever any agency relationship between National Risk and the plaintiff in the procurement of the policy. For these reasons, the judgment in favor of the plaintiff and against Lexington is affirmed.

We turn now to Lexington's claim that the judge erred in granting summary judgment to Rose-Tillmann on Rose-Tillmann's claim for indemnity from Lexington. Lexington maintains that "there are disputed issues of fact as to whether Lexington breached the settlement agreement, thereby causing Rose-Tillmann to fail to pay Envi-

ronetics." Lexington also maintains that there are issues of material fact as to whether Rose-Tillmann was "without fault in fact." For reasons already expressed, we repeat that the record shows that Lexington, as a matter of law, breached the settlement agreement. The basis of Lexington's second argument is that Rose-Tillmann knew or should have known of National Risk's financial condition and that Rose-Tillmann knew or should have known that National Risk would receive the return premium from Midwestern and Lexington in the "course of performance of their obligations under the settlement agreement."

The factual basis of Lexington's claim that Rose-Tillmann knew or should have known of the precarious financial condition of National Risk is based on the fact that Rose-Tillmann's president, William Holler, was a director of National Risk until March 1991, and was a shareholder and substantial investor in National Risk after that. Our brief answer to Lexington's argument is that National Risk was not an agent of the plaintiff or Rose-Tillmann for the purpose of return of the premium.

Implicit in Lexington's argument is the supposition that the plaintiff would have been under some obligation to move against National Risk for the return of the premium if the plaintiff knew of National Risk's precarious financial position. Lexington cites no authority in support of its argument, and we are confident none exists. We are confident that the plaintiff, if made aware of National Risk's possible insolvency, would not have done anything differently. It would have assumed that under the agreement Lexington was obliged to pay; and it would have proceeded accordingly.

For these reasons, the judgment in favor of Rose-Tillmann is affirmed.

Judgments affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.